295 N.J. Super. 335 (1996)
685 A.2d 40
SIDNEY UNDERWOOD, PLAINTIFF-APPELLANT,
v.
ATLANTIC CITY RACING ASSOCIATION, A NEW JERSEY CORPORATION, T/A ATLANTIC CITY RACE COURSE AND CALVI ELECTRIC CO., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1996.
Decided November 27, 1996.
*337 Before Judges SHEBELL, BAIME and PAUL. G. LEVY.
Michael D. Schottland argued the cause for appellant (Schottland, Aaron & Manning, attorneys; Mr. Schottland and Bettina E. Munson, on the brief).
Jennine DiSomma argued the cause for respondent Atlantic City Racing Association (Saiber, Schlesinger, Satz & Goldstein, attorneys; William F. Maderer, Deanna M. Beacham and Susan A. Rozman, on the brief).
Donna L. Freidel argued the cause for respondent Calvi Electric Co. (Joel Felscher, attorney; Mr. Freidel, on the brief).
The opinion of the court was delivered by PAUL G. LEVY, J.A.D.
Plaintiff, a professional jockey, sustained catastrophic injuries when she was thrown from her horse during a race at the Atlantic City Race Track on June 19, 1992. The thrust of plaintiff's claim was that defendants' negligence affected the track's rail shadow which caused the horse to fall, throwing plaintiff to the ground. Plaintiff alleged that Atlantic City Racing Association (ACRA) was negligent for failing to provide a facility "reasonably safe for the uses to which it was properly put," and Calvi Electric Co. was negligent in the maintenance and operation of the lighting system at the track. Prior to empaneling a jury, the trial judge granted *338 ACRA's motion in limine and held that the appropriate standard of care to which defendants would be held was reckless or intentional conduct. Then, in a procedure akin to summary judgment, the judge found the evidence presented was insufficient to permit a jury to decide that defendants' conduct was reckless or intentional. By order of February 20, 1996, plaintiff's complaint was dismissed and judgment was entered for defendants. We reverse and remand the matter for trial.
Each party presented the trial judge with reports from expert witnesses. Plaintiff had two witnesses: John Forbes, an experienced thoroughbred racing horse trainer, and William Poznak, an engineer; ACRA offered a report from Walter Blum, the State Steward for the racing industry in Florida. Forbes reviewed a videotape of the race in which plaintiff was injured and noted he was "familiar with the layout of the Atlantic City Race Track as it was at the time of the accident." He discussed that a crucial safety factor was sufficient and proper illumination and "[i]f possible, the rail as well as the arrangement of the lighting towers should be established to minimize the shadows that may be created through the interaction of the light with these structures. It is essential that the track be laid out in such a fashion as to minimize shadows on the racing surface and that no dim or inconsistent areas are created through artificial conditions." It was his opinion that "the shadow immediately adjacent to the rail is clearly visible on the videotape and was a contributing factor in the accident of Sidney Underwood, as it appears that the horse ... did not wish to either step on the shadow or cross over in the area closer to the rail beyond the shadow."
Poznak reviewed a set of plans of the racetrack which revealed that the architect intended to provide "twenty foot candles of light at all portions of the racetrack surface. Each light fixture/bulb had a definite purpose and destination in carrying out that intent." His inspection of the track and review of the maintenance records Calvi provided "reveal[ed] no effort was made during maintenance of the lights and stanchions to conform to the requirements of *339 providing twenty foot candles for each area of the track." He concluded that:
[A]t the time of the accident in question, the defendants had deviated from the standard in the industry and had deviated from the intended lighting for this specific track through a series of actions and inactions regarding the care and maintenance of the lighting equipment subsequent to the initial installation, and which resulted in the creation of a shadow on the traveled portion of the racetrack, which, as Mr. Forbes has indicated, should have been avoided.
Blum also reviewed the videotape of the race. In his opinion "Ms. Underwood while astride [the horse] approaches the vicinity of the 3/8 pole and running along the rail, simply gets caught in very tight quarters as the horses on her outside change leads and come in to make the turn, as all horses do." He stated he understood "Forbes is of the opinion that [plaintiff's] horse didn't want to step on the shadow cast by the inner rail and in so doing caused the animal to collapse and fall." Blum disagreed, stating he did "not believe that the shadow caused the horse to collapse and fall. I have never seen a horse collapse and fall due to a shadow. Every racetrack in the world has a shadow obvious to see either at daytime or nighttime caused by the natural sun, or as in [plaintiff's] case, lights." He maintained that the horse never jumped or tried to jump over a shadow but "simply [was] put in too tight a position to maintain stride and falls," that plaintiff was "caught in the wrong place at the wrong time and down she goes"; he concluded that such an accident "goes with the territory, and that is a fact all jockeys know and accept."
Four months before the trial, another judge considered ACRA's motion for summary judgment in which ACRA posited that "the only duty owed to plaintiff ... was to refrain from reckless or intentional conduct." ACRA cited Crawn v. Campo, 136 N.J. 494, 643 A.2d 600 (1994), as authority for its claim. The motion judge considered the contents of the Forbes and Poznak reports and denied the motion. He specifically held the applicable standard of care to be ordinary negligence, not reckless or intentional conduct. In leaving it to a jury to determine the credibility and the weight of the expert testimony, the judge ruled:

*340 [I]t would appear from the documents filed that ... [ACRA] created and knew of the condition which allegedly caused the accident. On that basis, even if the standard was reckless and intentional conduct, the plaintiff would meet the standard. Secondly, this is a work-place type accident, and it is the duty of the owner of the premises to provide a safe place for persons who are employed by it or employed by others who require the plaintiff to perform the plaintiff's services.... The standard here is a mere negligence standard. But even if the standard is reckless and intentional conduct, this plaintiff has alleged sufficient facts supported by his expert reports. (emphasis added).
Additionally, Calvi brought a motion for summary judgment, and it was denied because there was a material factual question as to what was required of Calvi by ACRA.
"The `law of the case' doctrine sometimes requires a decision of law made in a particular case to be respected by all other lower or equal courts during the pendency of that case." State v. Reldan, 100 N.J. 187, 203, 495 A.2d 76 (1985). "Prior decisions on legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous." Atlantic Employers Ins. Co. v. Chartwell Manor School, 280 N.J. Super. 457, 470, 655 A.2d 954 (App.Div. 1995) (citing Sisler v. Gannett Co., 222 N.J. Super. 153, 159, 536 A.2d 299 (App.Div. 1987), certif. denied, 110 N.J. 304, 540 A.2d 1283 (1988)).
In accordance with the "law of the case doctrine" case, the trial judge should have applied the standard decided by the motion judge, that of ordinary negligence, and denied defendants' motion in limine. Because no new facts or evidence were presented to the trial judge, he was obliged to respect and follow the ruling of the motion judge, rather than to reject his determination as to the appropriate standard of care. Instead, the trial judge did not accept those earlier rulings, and actually reversed them, when he decided to reject ordinary negligence as the appropriate standard of care. He discounted the opinions of plaintiff's experts and determined that the heightened standard of care of recklessness was applicable. He relied on Crawn, where the Court found it appropriate to apply the recklessness standard to injuries to participants in informal athletic and recreational sports activities, *341 and on Turcotte v. Fell, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), where the New York Court of Appeals held that a racetrack owner was not liable for injuries to a jockey allegedly caused by inconsistent conditions of the track surface during a race. The trial judge recognized that Crawn dealt with the interaction of the participants in the game "as opposed to the duty of the one who supplies the workplace, so to speak ... or the track." He then relied on Turcotte and seemingly decided, without analysis or explanation, that the applicable standard of care was reckless or intentional conduct.

I.
In Crawn, plaintiff was playing the position of catcher in a pickup softball game and was injured when defendant, attempting to score from second base, either slid or ran into him at home plate. The impact and resulting injuries were not related to the condition of the playing field. At issue was the legal standard of care to apply to defendants' conduct. The Court recognized it was unrealistic to expect the participants to agree on the type of physical contact to be expected during the contest. It concluded that basing a duty of care on the behavior of an average reasonable person participating in a recreational athletic event would be "illusory" and not easy to apply consistently. Therefore, it held "the duty of care in establishing liability arising from informal sports activity should be based on a standard that requires, under the circumstances, conduct that is reckless or intentional." 136 N.J. at 508, 643 A.2d 600. The Court expected that this rule would "leav[e] free from the supervision of the law the risk-laden conduct that is inherent in sports and more often than not assumed to be `part of the game.'" Ibid. The Court also noted:
Anytime a court raises the standard of care that defines the legal duty that is owed for the safety of others, it implicitly immunizes a part of the conduct that otherwise would be considered tortious and actionable.... New Jersey tolerates immunities only for important reasons of public policy and in relatively exceptional situations, and therefore strongly endorses a standard of care based on ordinary negligence.
[Id. at 502, 643 A.2d 600.]
*342 In Turcotte, the Court recognized that a racetrack owner "owed the same general duty to those using its property as to owners of real property generally, the duty to exercise `reasonable care under the circumstances.'" 68 N.Y.2d at 442, 510 N.Y.S.2d 49, 502 N.E.2d 964. In that case, however, the Court held the racetrack owner's duty to a jockey is "measured by [the jockey's] position and purpose for being on the track ... and the risks [the jockey] accepted by being there." Ibid. The complaint was dismissed because:
Turcotte's participation in three prior races at this same track on the day of his injury, his ability to observe the condition of the track before the eighth race and his general knowledge and experience with cupping[1] conditions and their prevalence establish that he was well aware of these conditions and the possible dangers from them and that he accepted the risk.
[Id. at 443, 510 N.Y.S.2d 49, 502 N.E.2d 964.]
While Turcotte is similar to the instant case because each concerns conditions of the racetrack, there is no indication that the wet track encountered in Turcotte was unusual or in any way substandard. Here, plaintiff's experts' reports indicate that the lighting conditions of the racetrack were not to be expected because they were substandard. It was Poznak's opinion that negligence in the installation and maintenance of the lighting system "resulted in the creation of a shadow on the traveled portion of the racetrack, which ... should have been avoided." That was because "the shadow that should have been created would have been at the foot of the safety rail, or perhaps no more than one foot onto the traveled surface of the track." Instead, the videotape of the race showed "a shadow which is encroaching far onto the traveled portion of the track to a distance that exceeds the approximate distance that any shadow from those [light] stanchions should have caused."
Defendants' arguments that jockeys must expect a rail shadow, and the chance that a horse might shy away from it, do not *343 address plaintiff's claims. Provision and maintenance of a lighting system that does not comply with industry standards produced an extra large shadow which was a condition of the workplace that was not "inherent in sports and more often than not assumed to be `part of the game.'" Crawn 136 N.J. at 508, 643 A.2d 600. We are confident that the New York Court of Appeals would have applied an ordinary negligence standard under the conditions on which Poznak's opinion was based, even though this jockey participated in another race on the same day under similar conditions.

II.
While our conclusion that the appropriate standard of care is ordinary negligence requires the matter be remanded for further proceedings, we also conclude that summary dismissal of the complaint was erroneous. In Brill v. Guardian Life Ins. Co. of Am., the Court stated:
[A] determination whether there exists a `genuine issue' of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. The `judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986))
[142 N.J. 520, 540, 666 A.2d 146 (1995).]
The jury, not the judge, will continue to make credibility determinations and "[i]f there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a `genuine' issue of material fact for purposes of R. 4:46-2." Ibid. The evidence must be so one-sided that one party must prevail as a matter of law in order to grant summary judgment. Ibid.
The trial judge gave no weight to the Forbes and Poznak reports, contrary to the dictates of Brill. Perhaps the judge was too focused on applying the recklessness standard to the conditions about which these two experts opined. This case, however, *344 does involve a material factual dispute concerning whether or not the installation and maintenance of the lighting was negligent and created a dangerous condition causally related to plaintiff's accident. Plaintiff's expert opined defendants had deviated from industry standards and from the intended lighting for this specific track, resulting in the unusual shadow. Defendants' expert disagreed, blaming plaintiff's fall on the proximity of the other horses in the race. When the evidence is viewed in the light most favorable to plaintiff as the non-moving party, a rational jury could find plaintiff's experts credible and resolve the disputed issue in favor of plaintiff. Brill, supra, 142 N.J. at 540, 666 A.2d 146. The evidence is not so one-sided that defendants must prevail as a matter of law.
Reversed and remanded for trial.
NOTES
[1] The tendency of a wet track surface to stick to the underside of a horse's hoof within the shoe, which was alleged to have caused or contributed to the jockey's injuries.